IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| TAD MAYFIELD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:21-CV-04059-MDH |
| | ) |
| DANA RADEMAN MILLER, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

Before the Court is Defendants Dana Rademan Miller's and Emily White's ("Defendants") Motion for Summary Judgment (Doc. 59). For the reasons set forth herein, the Motion is **DENIED**.

## BACKGROUND

Plaintiff Tad Mayfield worked for the Missouri House of Representatives ("House") from August 29, 2011, until his termination on August 6, 2020. Plaintiff was employed by the House at the time as a Legislative Specialist II. Defendant Dana Rademan Miller ("Miller") held the title of Assistant Chief Clerk in 2013, and she was Plaintiff's direct supervisor until 2018. In 2018, Miller was promoted to Chief Clerk, and Defendant Emily White ("White") was promoted to Assistant Chief Clerk and became Plaintiff's new direct supervisor until Plaintiff's termination. Plaintiff alleges he was wrongfully terminated from his employment at the House as a result of advocating for a mask mandate in the Capitol building through emails. Plaintiff brings this action for First Amendment retaliation under 42 U.S.C. § 1983 against Defendants.

During the calendar year 2020, the globe, including the State of Missouri, dealt with emergent and changing public health needs due to the COVID-19 pandemic. Nationwide, requirements and recommendations that face masks be worn to combat the spread of the virus were

1

common. The House did not issue a mandate or requirement that masks be worn in the Missouri State Capitol building. Under various House procedures, Plaintiff and other employees had been permitted to work from home beginning on March 12, 2020. Plaintiff sent several emails relating to the House's lack of a mask mandate, two of which are of primary concern in this case.

On July 28, 2020, White emailed Plaintiff regarding adjusting his schedule to include one day of in-office work per week. In response, Plaintiff sent an email ("the July 28 email") to White, Miller, and then-Speaker of the House, Elijah Haahr on July 28, 2020. The email reads, in part:

> Anyway, over the past four months I feel Susan and I have become adept at navigating our new reality with very little risk to our health. It is very irritating to see people out in public with no concern for the safety and wellbeing of others. I am happy that a lot of businesses have adopted mandatory face coverings to gain entry. We went inside the first department store (Kohl's) we've been to in five months yesterday, because face coverings were required. I certainly appreciate and want to acknowledge the efforts you have taken to help reduce the risks to us, your staff, by installing the dutch door and plexiglas, as well as, allowing us to lock the office. ***I assume, since I haven't heard otherwise, that the House is still not requiring face masks in the Capitol? This is disappointing since the single most important thing people can do to help stop the spread of an airborne virus is to wear a face mask; which greatly reduces the amount of germs they leave in the environment around them. This becomes especially important when people can be carriers/spreaders without knowing they have the virus***. At the same time, ***I have guilt over others being required to work in this hostile environment while I have been secure in my home.*** At the risk of sounding confrontational, which I in no way wish to convey, ***I think it is important to state unequivocally, by not requiring face coverings, the House has become a hostile work environment***. For sure, countries that have mandatory face covering in public have seen great reductions in the spread of covid-19 and, as a result, fewer hospitalizations and death. If face masks were required for everyone in the Capitol, I would see no reason why we all couldn't go back to work with relative safety.

(Doc. 60, Ex. M) (emphasis added). Plaintiff sent multiple emails following up on this first July 28 email on July 28 through July 31. *Id*. Those subsequent emails pertained to the same subject matter as the first July 28 email.

Second, Plaintiff sent an email ("the August 3 email") to Haahr and the President Pro Tem of the Missouri Senate, Dave Shatz, on August 3, 2020. The email reads, in whole:

> Dear Speaker Haahr and President Pro Tem Schatz,
>
> ***I am writing to you because I feel an ethical and moral obligation to do so.*** We are living in unprecedented times that requires, likewise, unprecedented actions and decisions from the leadership and citizens of our state. Those actions and decisions, or lack thereof, will be recorded in history as either appropriate measures that helped save lives, or inappropriate and resulted in an increase in lives lost.
>
> Businesses, cities, and states across this great nation have heeded the CDC's warnings and implemented a number of measures designed to slow/stop the spread of COVID-19, including mandatory face coverings, if we are to continue in our efforts to reopen the economy and get people back to work. I am grateful the Missouri House of Representatives has implemented some of the same measures in an attempt to protect Members, staff, and visitors to our Capitol. ***Unfortunately, as of yet, the decision to require face coverings in the chambers and public spaces in our Capitol has not been made, leaving all who enter our Capitol at greater risk of contracting COVID-19, and ultimately, negates any benefit received by the measures that have been implemented.***
>
> ***It is important to consider, Members from every district in this state are convening in our chambers and then returning to their respective communities to continue campaigning and holding fundraisers for their reelection bids, or assisting in the election of their successors. It compounds an already serious health crisis for Members to unknowingly contract or transmit COVID-19, due to the lack of a mask mandate in our Capitol, and then return home to unknowingly transmit it to their constituents. All this while hundreds if not thousands of new cases are reported in our state every day.***
>
> ***For the health and well-being of all who enter our Capitol***, I am requesting that you, as leadership in the House and Senate, adhere to CDC guidelines and implement a mandatory face mask policy for all spaces within our Capitol, excluding the personal office spaces of Members.
>
> With all due respect and for the safety of all Missourians,
>
> Tad Mayfield
> Legislative Specialist – Procedures
> Assistant Chief Clerks Office
> Missouri House of Representatives
> (573) 522-3141

(Doc. 60, Ex. O) (emphasis added).

It is undisputed that Plaintiff could not perform all his job duties while working from home.

Plaintiff states that he was planning to return to work on August 14, 2020. While Defendants assert

3

that Plaintiff did not give his supervisor any assurance that he would return to work for the legislative session, multiple emails exchanged between Plaintiff and White between July 28, 2020, and August 5, 2020, support Plaintiff's statement. (Doc. 64, Exs. M, FF).

Defendants state that Miller, after consulting White, decided to terminate Plaintiff's employment on July 31, 2020, subject to final consultation with Judy Kempker, the former Director of Human Resources at the House, once she returned from leave. That fact is disputed, and Miller has since stated numerous times that the final decision to terminate Plaintiff's employment was made on August 4, 2020, and furthermore omitted Kempker from her list of those consulted or who participated in the decision to terminate Plaintiff on several occasions. Plaintiff was ultimately notified about the termination of his employment with the House on August 6, 2020.

**STANDARD**

Entry of summary judgment is appropriate when the movant has demonstrated that there is an absence of a genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In meeting this initial burden, a movant who would not bear the burden of proof at trial must only identify those parts of the record that demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"[I]n ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 1866. The court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). Any of the moving party's evidence that a jury is not required to believe must be disregarded. *Id.* at 151.

This includes evidence that is contradicted, impeached, or comes solely from interested witnesses. *See id.* Departure from these "fundamental principle[s]" is forbidden. *See Tolan*, 134 S.Ct. at 1863; 1868.

**DISCUSSION**

To establish a prima facie case of retaliatory termination, a plaintiff must both allege and prove that (1) his speech was protected by the First Amendment, (2) the governmental employer discharged him from employment, and (3) the protected speech was a substantial or motivating factor in the defendant's decision to take the adverse employment action. If the plaintiff meets this burden, the burden shifts to the defendant to demonstrate that the same employment action would have been taken in the absence of the protected activity. *Rynders v. Williams,* 650 F.3d 1188 (8th Cir. 2011); *Davison v. City of Minneapolis, Minn.,* 490 F.3d 648 (8th Cir. 2007). There is no dispute that Defendants discharged Plaintiff from employment. Therefore, the only issues at this stage are whether Plaintiff's speech was protected by the First Amendments and, if so, whether the protected speech was a substantial or motivating factor in the Defendants' decision to terminate Plaintiff's employment.

**I. Plaintiff engaged in protected activity by sending the August 3 email**

To establish a claim of employer retaliation under the First Amendment, Plaintiff must show that "he engaged in activity protected by the First Amendment." *Lyons v. Vaught*, 875 F.3d 1168, 1172 (8th Cir. 2017) (*Lyons II*) (quoting *Lyons v. Vaught*, 781 F.3d 958, 961 (8th Cir. 2015)); *see also Garcetti v. Ceballos,* 547 U.S. 410, 418, 421(2006). "A public employee's speech is protected under the First Amendment if he spoke as a citizen on a matter of public concern, but a public employee's speech is not protected if he spoke pursuant to his official duties." *Groenewold v. Kelley*, 888 F.3d 365, 371 (8th Cir. 2018). The critical question is "whether the speech at issue

5

is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lyons II*, 875 F.3d at 1173 (quotation omitted); *Lane v. Franks*, 573 U.S. 228, 240 (2014) (The "critical question" in determining whether a public employee spoke as a citizen is whether the "speech at issue is itself ordinarily within the scope of an employee's duties."). If it is, then the employer may regulate it; otherwise, "the First Amendment provides protection against discipline." *Garcetti*, 547 U.S. at 421.

An employee's speech is part of his official employment duties "if it is 'part-and-parcel of' the employee's concerns about his ability to 'properly execute his duties.'" *Lyons v. Vaught*, 875 F.3d 1168, 1174 (8th Cir. 2017) (quoting *Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)). "Whether a public employee spoke as a citizen on a matter of public concern is a matter of law for the court and 'must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Bartlett v. Rock Twp. Ambulance Dist.*, 2012 WL 1309371, at *4 (E.D. Mo. Apr. 17, 2012) (quoting *Dahl v. Rice County, Minn.*, 621 F.3d 740, 744 (8th Cir. 2010)). "If the speech was mostly intended to further the employee's private interests rather than to raise issues of public concern, [his] speech is not protected, even if the public have an interest in the topic of the speech." *Bailey v. Dep't of Elementary & Secondary Educ.*, 451 F.3d 514, 518 (8th Cir. 2006).

a. **The July 28 email chain does not constitute protected activity**

Plaintiff correctly notes that Defendants do not argue whether Plaintiffs' string of emails beginning on July 28 and ending July 31 ("initial emails" or "July 28 email chain") constitute protected activity. Defendants appear to assume that Plaintiffs' initial emails regarding mask mandates in the Capitol were not protected by the First Amendment. Ultimately, as discussed in detail below, whether these emails constitute protected activity is relevant only to the question as

to whether Plaintiff's discharge was motivated by the July 28 email chain rather than the August 3 email.

While Defendants only argue that the August 3 email was not protected under the First Amendment, the analysis applies to the July 28 email chain. These initial emails were "part-and-parcel of" the employee's concerns about his ability to "properly execute his duties." *Lyons*, 875 F.3d at 1174. The content of those communications was primarily focused on Plaintiff's concerns about his personal return to the workplace. In his original July 28 email, Plaintiff emailed Miller and Haahr and stated that by not implementing a mask mandate, "the House has become a hostile work environment." (Doc. 60, Ex. M). Plaintiff testified that the parts of this email to White that discussed his work were sent by him in his capacity as a Legislative Specialist II. The following day, Plaintiff emailed White and requested "guidance as to whom I should contact in order to address my concerns about the safety of our work environment." *Id*.

Plaintiff then forwarded this email to Kempker and retitled the email "Workplace safety concerns," and wrote again that he had "concerns about the safety of our work environment at the Capitol." *Id*. Plaintiff sent this email to Human Resources because he believed the House had become a hostile work environment by not implementing a mask mandate in the Capitol. Finally, Plaintiff emailed Miller on July 31, 2020, titled the email "Workplace Safety Concerns," and emphasized that he was reaching out to her "in the hopes that my concerns about the safety of the workplace environment can be addressed." *Id*. Plaintiff's emails about implementing a mask mandate here revolve around his concerns of workplace safety and his return to work in the Capitol building; therefore, they relate to his official duties as a House employee.

Plaintiff argues that the initial emails are protected by the First Amendment because Plaintiff was speaking on a matter of public concern rather than pursuant to his job duties.

7

However, Plaintiff's position relies almost entirely on one small segment of language used in the July 29 email, where Plaintiff stated to White that he felt "ethically and morally obligated to express [his] concerns for not only [his] own safety and the safety of [his] family, but for the safety of all who enter the Capitol." (Doc. 60, Ex. M). Plaintiff admitted that the July 28 email chain dealt with his workplace but asserts that he was consistently concerned about public safety.

The Court recognizes that Plaintiff had concerns aside from his personal workplace safety. However, it is abundantly clear from the language of the July 28 email chain that Plaintiff was communicating his concerns about the safety of the Capitol building and need for a mask mandate regarding his anticipated return to the office. With the exception of the single phrase Plaintiff points to that he felt "morally and ethically obligated" to express his concerns for not only his own safety, but for "all who enter the Capitol," the content of the initial emails does not deal with a matter of public concern protected by the First Amendment.

The authority cited by Plaintiff is easily distinguishable from the instant case and does not support Plaintiff's argument. Plaintiff cites *Lindsey v. City of Orrick, Missouri,* 491 F.3d 892 (8th Cir. 2007) for the proposition that the July 28 email chain was not related to Plaintiff's official duties. In *Lindsey*, the city public works director, whose duties included maintaining the city's parks, water systems, streets, and sewers, spoke at several city council meetings about what he believed to be the city's noncompliance with the state's "sunshine" law. *Lindsey*, 491 F.3d at 895–96. Lindsey questioned whether the city was violating the law by entering into non-public executive sessions and passing city ordinances without public discussion. *Id.* at 896.

The Eighth Circuit found criticism of a city council's "practices surrounding the passage of ordinances and its apparent lack of sunshine law compliance" to be "clearly on a matter of public concern." *Id.* at 899. The court specifically rejected the City's argument that the speech was not

8

personal in nature due to the Plaintiff's complaints about the ordinances affecting retirement benefits, noting, "[w]hile the record reflects that some of the ordinances at issue involved retirement benefits, *this was not the thrust of Lindsey's complaints.*" *Id.* (emphasis added). In addition, the Court noted that the Plaintiff spoke as a citizen because "*there is no evidence Lindsey's job duties even arguably included sunshine law compliance*," even though the city had paid him to attend a seminar at which he happened to learn enough about the topic and even though his speech occurred at council meetings he was required to attend as part of his job. *Id.* at 895 (emphasis added).

It is undisputed that Plaintiff's job duties as Legislative Specialist II did not involve taking care of the health or safety of those who entered the Capitol building. However, the July 28 email chain clearly indicates that Plaintiff's concern about his own return to the workplace was clearly the "thrust of [his] complaints." *Id*. at 899. It is undisputed that the requested physical presence of Plaintiff in the workplace by his supervisors was part of his job duties. While Plaintiff, as he argues, may have otherwise had greater concern about public safety, the July 28 email chain communication itself was "ordinarily within the scope of the employee's duties." *Lane*, 573 U.S. at 240. Accordingly, Plaintiff's emails between July 28, 2020, and July 31, 2020, were not protected activity under the First Amendment.

   b. **The August 3 email constitutes protected activity**

The primary communication at issue in this case in Plaintiff's August 3 email. Defendants argue that this email is not protected under the First Amendment because it was related to the prior July 28 email chain. However, this is not a relevant inquiry. The August 3 email is distinguishable from Plaintiff's prior emails and the content is significantly different in nature. Neither White nor Miller, Plaintiff's supervisors, were copied on the August 3 email sent by Plaintiff to Haahr and

9

Case 2:21-cv-04059-MDH   Document 68   Filed 06/21/22   Page 9 of 18

Schatz. It is undisputed that Plaintiff sent the August 3 email affirmatively seeking a mask mandate to keep those who wanted to visit the Capitol safe, and to keep people in the House member's District safe from House members that would take COVID-19 back to them. He expressed his concern that the Capitol had the potential to be super spreader event during a campaign year. Such a concern was, in part, based upon the fact that House members would campaign by knocking on doors after leaving the Capitol.

Defendants suggest that the fact that Plaintiff used his work-issued computer and email address to send the August 3 email may prevent it from constituting protected activity, though there is no support for this. As Plaintiff notes, the content of the communication is what controls. For example, in *Lindsey*, the plaintiff in that case spoke at city council meetings that they were required to attend as a member of the city council. Their presence and speech at their work-required time and location was not meaningful to the inquiry of whether the speech was protected by the First Amendment.

Nothing contained in the August 3 email indicates that Plaintiff was expressing concern about performing his own job duties, nor does it express direct concern for his own presence in the workplace. The language is clear—Plaintiff meant to tell those with authority over the House and Capitol decisions on COVID-19 protocol his concerns about how a lack of a mask mandate in the Capitol could have led to or heightened an ongoing public health crisis. Plaintiff pointed to potential dangers from citizens going in and out of the Capitol and House members traveling to and from their districts during a campaign year. Nowhere does Plaintiff imply that he had concern over returning to the office pursuant to his job duties.

Defendants primarily cite *Mantle v. City of Country Club Hills*, 2008 WL 3853432 (E.D. Mo. Aug. 15, 2008) for the proposition that the August 3 email was within the scope of Plaintiff's

10

Case 2:21-cv-04059-MDH   Document 68   Filed 06/21/22   Page 10 of 18

job duties. It is unpersuasive. In *Mantle,* the plaintiff, a former Chief of Police, sued a city for First Amendment retaliation when his employment with the city's police department was terminated after he spoke up about the criminal misconduct of a former city official. *Id*. at *1. The plaintiff alleged that he heard about the misconduct in a personal phone call, so he was not acting in his official capacity as a police officer when he reported the misconduct. *Id*. at *3. The plaintiff also asserted that the person he spoke with did not ask him to file an official report. *Id*. Further, the plaintiff said he reported the misconduct to a local judge as a friend, not because of his role as Chief of Police. *Id*. In response, the defendants asserted that despite the plaintiff's intentions, as a police officer, he had a duty to report criminal conduct, even if he was not specifically asked to do so. *Id*. at *4. The Court ultimately followed the defendants' line of reasoning and held that the plaintiff was operating in his official capacity in making his report of the criminal misconduct, so he could not sustain a cause of action under the First Amendment. *Id*.

*Mantle* is simply not on point for the instant case. Plaintiff's duties as a Legislative Specialist II were enormously different than the nature of a law enforcement officer's duties. In no circumstance was Plaintiff required to communicate to those with proper authority that a lack of certain safety measures could put the House and the Capitol building at great risk relating to a public health crisis. Considering the August 3 email communication was directly related to a matter of public concern, Defendants provide no persuasive authority to suggest that the August 3 email does not constitute protected activity.

The analysis and reasoning of *Lindsey*, as discussed above, remains the most applicable authority. While that analysis supported the conclusion that Plaintiff's other emails did not constitute protected activity, it supports the opposite conclusion for the August 3 email. As noted in *Lindsey*, the "thrust" of the plaintiff's complaints in that case were on a matter of public concern

11

unrelated to their job duties, even though the plaintiff's complaints also touched on their retirement benefits. *Lindesy*, 491 F.3d at 899. Here, while Plaintiff's August 3 email tangentially touched on his own safety concerns relating to his return to the office place, the "thrust" of his communication dealt with the safety of the general public due to a lack of a mask mandate at the State Capitol.

Accordingly, the Court finds that Plaintiff's August 3 email was protected activity under the First Amendment as a matter of law. Plaintiff therefore satisfies the first requirement of his First Amendment retaliation claim. Because his discharge is not disputed, the final element of a retaliation claim is the only remaining issue in resolving the instant Motion for Summary Judgment.

## II. A reasonable jury could find that the August 3 email was a substantial or motivating factor in Plaintiff's termination

"Whether the protected conduct was a substantial or motivating factor in an employment decision is a question of fact, but the sufficiency of the evidence to create an issue of fact for the jury is solely a question of law." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) (citation omitted). A plaintiff can prove a substantial or motivating factor "through either direct or indirect evidence." *Wagner,* 664 F.3d at 271 (citation omitted). "A plaintiff need only prove that the employer's discriminatory motive played a part in the adverse employment action." *Id.* (*citing Davison*, 490 F.3d at 657).

### a. Temporal proximity of the protected activity and discharge

Both parties argue that the timing of Plaintiff's emails and the termination of his employment support their positions. "Temporal proximity between protected activity and an adverse employment action can contribute to establishing the third element of a prima facie case of retaliation." *Davison v. City of Minneapolis, Minn*, 490 F.3d 648, 657 (8th Cir. 2007). If there is sufficient evidence to indicate that a plaintiff's protected activity was a motivating factor in the

adverse action, "the burden now shifts to [Defendants] to demonstrate that the same employment action would have been taken even in the absence of the protected activities." *Id*. at 658 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Altonen v. City of Minneapolis*, 487 F.3d 554, 560 (8th Cir. 2007)). This is referred to as the "*Mt. Healthy* defense," and "at the summary judgment stage, [it] requires the employer to show that the record would compel a reasonable jury to find that the adverse action would have occurred anyway, not merely that such action would have been warranted anyway." *Mahn v. Jefferson Cty., Missouri*, 891 F.3d 1093, 1098 (8th Cir. 2018) (quoting *McCue v. Bradstreet*, 807 F.3d 334, 346 (1st Cir. 2015)) (internal quotations omitted).

Defendants argue that the decision to terminate Plaintiff was made on July 31, 2020, and thus occurred before the August 3 email. Plaintiff's argument that the July 31, date is irrelevant because of Plaintiff's July 28 email chain holds no weight, because the Court found that his emails prior to August 3 do not constitute protected activity. Still, the Court finds that there remains a genuine issue of material fact as to the date on which Plaintiff's termination was decided.

Here, Defendants claim that the "decision" to terminate Plaintiff was made on July 31, 2020, subject to "final consultation" with Kempker. According to Defendants, after consulting with Kempker once she returned from leave, the "final decision" to terminate Plaintiff's employment was made on or around August 4, 2020. Miller testified that she made the decision on August 4, 2020. Second, both Defendant White and Defendant Miller were asked in Interrogatories to "state with specificity the date you made the decision to terminate Plaintiff." Neither identified July 31, 2020. Miller swore under oath that "[t]he final decision to terminate Plaintiff's employment was made on approximately August 4, 2020. White swore under oath that "[t]he final decision to terminate Plaintiff's employment was made on or about August 4, 2020."

13

Both Defendant White and Defendant Miller were asked in Interrogatories to identify "all individuals that were consulted, participated, or otherwise involved in the decision to terminate Plaintiff." Both Defendant White and Defendant Miller only identified themselves and House General Counsel Bryan Scheiderer. Neither identified Kempker in their respective Interrogatories as having been consulted, participated, or otherwise involved in the decision to terminate Plaintiff.

Both Defendant White and Defendant Miller were asked to state with specificity each person's involvement that were consulted, participated**,** or otherwise involved in the decision to terminate Plaintiff. Again, neither identified Kempker. When confronted with these inconsistencies, White could not recall the reason she stated on or about August 4, 2020, in her Interrogatory Response, and conceded "I can't account for the differences." Miller, on the other hand, claimed that "final decision" of August 4, 2020, in her Interrogatory Response meant the date she spoke to Kempker about "moving forward" with Plaintiff's termination.

If the decision to terminate Plaintiff was made on August 4, the temporal proximity would be extraordinarily compelling. *See, e.g., Klossing v. Cole*, No. 17-03064-CV-S-SRB, 2019 U.S. Dist. LEXIS 5951, at *8-9 (W.D. Mo. Jan. 14, 2019) (finding three-week temporal proximity between First Amendment activity and Plaintiff's dismissal sufficient to demonstrate protected conduct was a substantial or motivating factor). The Court finds that there is a genuine dispute of fact as to whether Defendants' decision to discharge Plaintiff was made before or after the August 3 email.

### b. Plaintiff's job performance

Defendants further argue they are entitled to a *Mt. Healthy* defense because evidence of poor job performance by Plaintiff would have led to his termination regardless of the August 3 email. Defendants testified that there were periods of poor performance by Plaintiff. For example,

Miller documented in an email to Kempker that she met with Plaintiff regarding "performance issues" including "general problem solving/legislative procedural knowledge," "session prep," "productivity," and "general situational awareness and professional investment in his position and within the office." There is testimony from Plaintiff's co-workers that Plaintiff struggled to work as part of a team. Specifically, Plaintiff had a heated argument with a co-worker, which led to Plaintiff meeting with Miller the following day. On another occasion, Plaintiff was counseled by Miller because he had scheduled a vacation without notifying her. Plaintiff recalls undergoing informal counseling with Miller during his employment with the House.

Plaintiff disputes the characterization of this evidence. "Pretext may be shown with evidence that an employer has proffered an explanation with no basis in fact, with evidence that the plaintiffs recently received favorable reviews, or with evidence that the employer's proffered reason for its employment decision has changed substantially over time." *Morris*, 512 F.3d 1013 at 1019 (citation omitted). *See also, Klossing*, at *8-9 (W.D. Mo. Jan. 14, 2019) (finding satisfactory job performance sufficient to demonstrate protected conduct was a substantial or motivating factor).

Plaintiff was never formally reprimanded or placed on corrective action or reprimanded by Miller at any point in his employment. White admitted that she never issued Plaintiff a written warning or placed him on probation. Plaintiff's performance reviews were always satisfactory. For example, in Plaintiff's Employee Performance Summary for the time period of September 2017 through September 2018, Defendant Miller noted that "I believe that [Plaintiff] has performed well this year and cannot think of any occasion when his performance did not meet expectations" and that his performance was satisfactory. When White became his supervisor, she noted in Plaintiff's Employee Performance Summary for the time period of July 1, 2018, through June 30, 2019, that

15

"[Plaintiff] is diligent in completing tasks and has worked well with other office staff. He is very detailed oriented. So, his work is always done with accuracy. [Plaintiff] has readily accepted and been supportive of changes within the office this year. He has been willing to take on additional responsibilities, such as the classified index as well as various tasks in the office during session. [Plaintiff] has also been willing to assist colleagues and help train our new employee.". As she testified in her deposition, White thought Plaintiff was doing a good job and contributing to the office for the period of the evaluation of July 1, 2018, through June 30, 2019. White made no entries in the Employee Performance Summary for the time period of July 1, 2018, through June 30, 2019, which requested that she "Describe areas, if any, in which the employee's performance could have improved during this time period."

In Plaintiff's Employee Performance Summary for the time period of July 1, 2019, through August 6, 2020, Defendant White noted, "I am unable to describe how the employee's performance met expectations because [Plaintiff] was removed from session operations. The essential responsibilities of the position are not suited to remote working and a majority of the duties were handled by others in the office. I had not been able to review his day-to-day indexing work product." However, she made no entries in the Employee Performance Summary for the time period of July 1, 2019, through August 6, 2020 which requested that she "Describe areas, if any, in which the employee's performance could have improved during this time period." *See, e.g., Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015) (although a lack of contemporaneous documentation alone is not evidence of pretext—employee must also demonstrate why the absence matters—here, the lack of documentation matters because the defendants charge Burton with a history of performance problems); *Carlton v. Mystic Transp.,*

16

*Inc.,* 202 F.3d 129, 137, (2d Cir. 2000) ("If Carlton's performance had declined, as defendant insists, it seems surprising that there was no contemporaneous proof of that fact").

Genuine issues of material fact as to Plaintiff's job performance further precludes a *Mt. Healthy* defense for Defendants. There is substantial evidence in the record from which a reasonable trier of fact could conclude that Defendants' reasons for terminating Plaintiff for poor job performance are pretextual. Similarly, there is sufficient evidence from which a reasonable jury could conclude that the protected August 3 email was a substantial or motivating factor in Plaintiff's termination.

In sum, both disputed and undisputed evidence in the record could lead a reasonable jury to find that the August 3 email was a substantial or motivating factor in Defendants' decision to terminate Plaintiff's employment. Defendants' purported *Mt. Healthy* defense requires them to show that the record "would compel a reasonable jury to find that the adverse action would have occurred anyway, not merely that such action would have been warranted anyway." *Mahn v. Jefferson Cnty.*, 891 F.3d 1093, 1098 (8th Cir. 2018) (reversing grant of summary judgment although Defendant showed that Plaintiff's dismissal may have been warranted anyway, it was not established that his performance would have "indisputably caused her termination."); *see also Wagner*, 664 F.3d 259 (8th Cir. 2011) (reversing summary judgment finding that issues of fact remained that Defendant would have made the same hiring decisions in the absence of Plaintiff's First Amendment rights). Defendants simply cannot do this in the case at hand.

## CONCLUSION

Genuine issues of material fact remain in the instant case which preclude this Court from entering summary judgment in favor of Defendants. The Court finds, as a matter of law, that Plaintiff's August 3 email constitutes protected activity for the purposes of his First Amendment

retaliation claim. The Court also finds that a reasonable jury could find that the protected activity was a substantial or motivating factor in Defendants' decision to terminate Plaintiff's employment. Accordingly, Defendants' Motion for Summary Judgment (Doc. 59) is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 21, 2022                                             _/s/ Douglas Harpool_
                                                                 **DOUGLAS HARPOOL**
                                                                 **United States District Judge**